IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| KIM GERETTE o/b/o E.C., a minor child, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 7:15-CV-12 |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Kim Gerette, on behalf of E.C., a minor child, filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding E.C. not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Gerette alleges that the Administrative Law Judge ("ALJ") erred by: (1) finding that E.C. did not functionally equal listing § 109.01; (2) failing to properly weigh the opinion of E.C.'s treating physician; and (3) improperly discounting Gerette's credibility. I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. No. 16), and **DENYING** Gerette's Motion for Summary Judgment (Dkt. No. 14).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that E.C. was not disabled under the Act.[1] Mastro v.

---

[1] Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and

1

Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Gerette, on behalf of E.C., protectively filed for SSI on March 17, 2011, claiming that E.C.'s disability began on February 24, 2010, due to diabetes and an attention deficit-hyperactivity disorder ("ADHD").[2] R. 187, 190. At the time Gerette filed for SSI, E.C. was 10 years old and, at the time of the ALJ's decision, E.C. was 12 years old. R. 25, 187, 193.

The state agency denied Gerette's application at the initial and reconsideration levels of administrative review. R. 59–66, 68–77. On June 24, 2013, ALJ Ann V. Sprague held a hearing to consider Gerette's disability claim on behalf of E.C. R. 36–58. Counsel represented E.C. at

---

severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

[2] The relevant period begins on March 17, 2011, as SSI benefits are not payable for any period prior to the filing of an application. See 20 C.F.R. §§ 416.202, 416.501.

2

the hearing, which included testimony from Gerette, who is E.C.'s mother, and medical expert Dr. Bennett.

The Social Security regulations provide a three-step sequential evaluation process for determining whether a minor is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is not disabled. Id. § 416.924(a), (b). Next, the ALJ must determine whether the claimant suffers from "an impairment or combination of impairments that is severe," if not, the claimant is not disabled. Id. § 416.924(a), (c). To qualify as a severe impairment, it must cause more than a minimal effect on the claimant's ability to function. Id. § 404.924(c). If an impairment is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then it is not severe. Id. If the claimant has a severe impairment, the analysis progresses to step three where the ALJ must consider whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listing. Id. § 416.924(a), (d). If the claimant has such impairment, and it meets the duration requirement, the claimant is disabled. Id.

On August 30, 2013, the ALJ entered her decision analyzing Gerette's claim under the three-step process. R. 13–25. The ALJ found that E.C. suffered from the severe impairments of diabetes mellitus and ADHD. However, the ALJ concluded that these impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 16. In making this determination, the ALJ specifically considered "109.01 (Endocrine Disorders) and 112.11 (Attention Deficit Hyperactivity Disorder)." Id.

The ALJ must consider the six relevant domains[3] of functioning to determine whether a severe impairment functionally equals a listed condition: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). Here the ALJ, after considering the six functional "domains" concluded that these impairments, neither individually nor in combination, were functionally equivalent to a listed condition. R. 16–24. Functional equivalence is defined as an impairment of listing-level severity. For example, it must result in "marked" limitations in two domains of functioning, or result in an "extreme" limitation in one domain.[4] 20 C.F.R. § 416.926a(a).

The ALJ concluded that E.C. had "no limitation" in the domain of moving about and manipulating objects and "less than marked limitation" in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and ability to care for himself. R. 19–24. The ALJ further concluded that E.C. had "marked limitations" in the domain of health and physical well-being. R. 24. Accordingly, the ALJ found that the claimant does not have an impairment or combination of impairments that result in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning. Id. Thus, the ALJ concluded that E.C. was not disabled. Gerette appealed the ALJ's decision, and on November 17, 2014, the Appeals Council denied her request for review. R. 1–5. This appeal followed.

---

[3] The domains "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).

[4] 20 C.F.R. § 416.926a(e)(2)(i) defines "marked" limitation as "more than moderate" but "less than extreme." A minor has a "marked" limitation in a domain when his impairment(s) interferes seriously with his ability to independently initiate, sustain, or complete activities. Extreme limitation is defined as "more than marked." 20 C.F.R. § 416.926a(e)(3)(i). While extreme limitation is the rating given to the worst limitations, it does not necessarily require a total lack or loss of ability to function. Id.

4

## ANALYSIS

Gerette asserts the ALJ erred by: (1) finding that E.C. did not functionally equal listing § 109.01; (2) failing to properly weigh the opinion of treating physician Jahanara Begum-Hasan, M.D.; and (3) improperly discounting her credibility.

### A. E.C.'s Medical History Regarding Diabetes Mellitus

E.C. was diagnosed with diabetes in February 2010, when he was 9 years old. R. 307. He presented to the emergency room at Lewis Gale Hospital on February 25, 2010 and was admitted to Roanoke Memorial Hospital Pediatric Intensive Care Unit as a transfer patient, with complaints of vomiting, dehydration and decreased consciousness. R. 307. Upon admission his glucose was 707 and he had severe ketoacidosis.[5] R. 307. He was discharged on February 28, 2010, with glucose of 186, and he was instructed to follow up with a pediatric endocrinologist, which he did. R. 307. Dr. Jahanara Begum-Hasan is E.C.'s treating pediatric endocrinologist. On May 12, 2011, E.C. presented to Dr. Begum-Hasan for a follow-up visit from his initial consultation. Dr. Begum-Hasan noted that E.C. had type 1 diabetes with suboptimal glycemic control, elevated HgbA1c, and a trend of hyperglycemia "most likely due to noncompliance with diabetes management." R. 438. However, Dr. Begum-Hasan also noted that E.C. was "clinically stable." R. 438. E.C. managed his diabetes by checking his blood sugar and administering insulin shots until July 2011, when he was prescribed an insulin pump.[6] R. 40–41,

---

[5] Ketoacidosis is a problem that occurs in people with diabetes; it occurs when the body cannot use sugar as a fuel source because there is not enough insulin and fat must be used for fuel instead. Byproducts of fat breakdown called ketones then build up in the body. See http://www nlm nih.gov/medlineplus/ency/article/000320.htm

[6] An insulin pump is a wearable device where a catheter is inserted through a needle into the abdominal fat of a person with diabetes. Dosage instructions are entered into the pump's small computer and the appropriate amount of insulin is then injected into the body in a calculated, controlled manner. See https://www.nlm.nih.gov/medlineplus/ency/imagepages/18035.htm.

5

457. E.C. reported to Dr. Begum-Hasan that he was "doing well with his insulin pump" and "has been enjoying his pump with less needle shot." R. 467.

Dr. Begum-Hasan noted that the insulin pump resulted in a trend of improved glucose control during E.C.'s office visits on August 9, 2011, November 10, 2011, February 13, 2012, September 6, 2012, and April 9, 2013. R. 469, 485, 495, 529, 566. However, E.C.'s blood sugar did continue to fluctuate, and Dr. Begum-Hasan noted a trend of moderate hyperglycemia during the day. Dr. Begum-Hasan also noted that E.C.'s glucose control was worsening during office visits on May 21, 2012 and January 8, 2013. R. 514, 542. The last office visit in the medical record from Dr. Begum-Hasan, on April 9, 2013, notes an "interval decrease in A1c which is reassuring." R. 566. On July 2, 2013, Dr. Begum-Hasan completed a questionnaire where he indicated that E.C. requires "24 hour supervision of his insulin treatment, food intake, and physical activity to ensure his survival." R. 593.

### B. Listing § 109.01

Gerette asserts that the "ALJ's conclusion that E.C. does not require the level of monitoring intended by listing § 109.1 is not supported by substantial evidence." Pl. Br. Summ. J. at 18, Dkt. No. 15. Gerette states that E.C.'s "activity has to be monitored at all times" and that "the ALJ failed to properly consider the extent of [E.C.'s] highly structured environment." Id. at 18-19. Gerette does not argue that the ALJ erred in assessing any specific domain of functioning; instead, Gerette asserts that E.C.'s impairment of diabetes mellitus functionally equals listing § 109.00(C) because he requires 24 hour medical supervision to manage his condition. Listing § 109.00, provides, in relevant part:

> For [] children with [diabetes mellitus ("DM")] who are age 6 or older and require daily insulin, and children of any age with DM who do not require daily insulin [], we follow our rules for determining whether the DM is severe, alone or in combination with another impairment, whether it meets or medically equals the criteria of a listing in another body

6

system, or functionally equals the listings under the criteria in § 416.926a, considering the factors in § 416.924a. The management of DM in children can be complex and variable from day to day, and all children with DM require some level of adult supervision. *For example, if a child age 6 or older has a medical need for 24-hour-a-day adult supervision of insulin treatment, food intake, and physical activity to ensure survival, we will find that the child's impairment functionally equals the listings based on the example in § 416.926a(m)(5).*

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 109.00(C) (emphasis added).[7]

Gerette testified at the hearing that, while the insulin pump has "helped quite a bit," E.C.'s blood sugar is still erratic, stating, "[I]t's just minute by minute, hour by hour with him, and we just try to do our best to keep him at adequate levels." R. 41. Gerette also testified that, even with the use of the insulin pump, E.C. has to perform finger pricks to check his blood sugar 7–10 times per day, and that "his blood sugar levels are still up and down." Pl. Br. Summ. J. at 16, Dkt. No. 15; R. 40–42. In response to the ALJ's question about whether E.C. is monitoring himself, or if an adult has to be constantly with him, Gerette stated, "He is owning more to it. He does all of [these] things on his own, without problem. Trouble being, when he's in an activity and if his adrenalin is up, and he's excited about something or distracted . . . and all of a sudden he'll crash as soon as he stops . . . ." R. 42. Gerette also testified that they chose to enroll E.C. in a small, private school where his teachers and friends remind him to check his blood sugar levels. R. 42, 51. While E.C. plays on a school soccer team, Gerette stated this is only possible because his father coaches the soccer team and "is always there with him." R. 52. Further, E.C. attends a camp designed for diabetic children, staffed with medical personnel available to monitor the campers. Pl. Br. Summ. J. at 17, Dkt. No. 15; R. 52. Gerette testified at the hearing

---

[7] 20 C.F.R. § 416.926a(m)(5) provides that the "[r]equirement for 24-hour-a-day supervision for medical (including psychological reasons)" is an example of an impairment and limitation that functionally equals the listings.

7

that E.C. is never alone; she even goes along with him on sleepovers, and sleeps in the guest bedroom in order to check his glucose at 2 a.m.[8]  R. 52–53.

The Commissioner argues that E.C. demonstrated no marked physical or mental limitations in caring for himself in an age-appropriate manner, and thus the ALJ reasonably concluded that E.C.'s impairments did not functionally equal the listings.

 In this case, the ALJ properly followed the three-step sequential evaluation process and I find substantial evidence to support the ALJ's opinion that E.C. was not markedly limited in two or more domains or extremely limited in one domain of functioning.  I also find substantial evidence to support the ALJ's opinion that E.C. did not require 24 hour supervision of his insulin treatment, food intake, and physical activity to ensure his survival.  In making her determination, the ALJ reviewed the medical evidence and noted that E.C. has regular visits with a pediatric endocrinologist, uses an insulin pump, and is compliant with his treatment plan.  The ALJ specifically referenced Gerette's testimony at the hearing that E.C.'s condition has improved with use of the insulin pump, and he is able to do more on his own.  R. 18.  The ALJ found that E.C "still experiences highs and lows in his blood sugar, but he has been able to spend time with friends and carry out age appropriate daily activities."  Id.  The ALJ further noted that "[E.C.'s] diabetes and ADHD do not prevent him from carrying out daily activities such as attending school, completing school work, participating in extra-curricular activities, and handling age appropriate behavior in the home setting.  Although his diabetes in particular requires monitoring, he has not required subsequent hospitalizations since his diagnosis and his blood sugars have been under much better control with the insulin pump use."  Id.

---

[8] E.C. has slept over at friends' homes without Gerette where the parents were doctors and monitored his blood sugar.  R. 52–53.

8

Case 7:15-cv-00012-MFU-RSB   Document 21   Filed 02/02/16   Page 8 of 17   Pageid#: 695

It is clear from the record that Gerette has done an admirable job caring for E.C., including helping to ensure that he adequately manages his diabetes. The fact that E.C.'s father coaches his soccer team, his mother is willing to accompany him on sleepovers, and he attends a summer camp designed for diabetic children both helps ensure E.C.'s safety and enriches his childhood. That said, I find that Gerette's argument that the ALJ "failed to properly consider the extent of [E.C.'s] highly structured environment" where "he is monitored 24 hours per day" lacks merit. Pl. Br. at 18, Dkt. No. 15. While Gerette indicated that when E.C. became excited or distracted, his adrenalin would increase, causing "up and down, and severe drops" the record does not support a finding that E.C. requires 24 hour adult supervision of insulin treatment, food intake, and physical activity to ensure survival. R. 42.

The ALJ specifically asked Gerette at the hearing whether E.C. monitors his blood sugar himself, or if an adult has to be there, "either because of [E.C.'s] age or because of his ADHD?" R. 41–42. Gerette responded that, "He does all of [these] things on his own, without problem." R. 42. Thus, because E.C. uses an insulin pump and monitors his blood sugar himself, there is substantial evidence that E.C. does not need 24 hour adult supervision of insulin treatment to ensure survival.[9] Compare Burner v. Colvin, No. 1328, 2014 U.S. Dist. LEXIS 51917, at *11–

---

[9] Effective June 7, 2011, the Social Security Administration published new medical criteria for evaluating diabetes mellitus. See Revised Medical Criteria for Evaluating Endocrine Disorders, 76 Fed. Reg. 19692-01 (Apr. 8, 2011). In responding to public comments, the Social Security Administration noted that children over the age of 6 are often able to participate to some extent in their own care, such that they do not functionally equal the requirement for 24-hour-a-day supervision for medical reasons set out in § 416.926a(m)(5):

> We recognize that not all children age 6 and older are capable of managing their own [diabetes mellitus]. In these children, however, the mere need for adult supervision does not establish disability; we need to determine the nature, frequency, and extent of the supervision they need along with any other relevant factors. . . . Many children age 6 and older with [diabetes mellitus] that requires daily insulin participate in their own care at least at the basic level of alerting adults when they begin to experience hypoglycemia symptoms, and they often participate at higher levels.
> . . .
> [A]s children mature, they should be able to increasingly take part in their self-care activities related to managing their [diabetes mellitus]. As a consequence, we do not agree that the diabetes mellitus of all children between the ages of 6 and 18 will meet the functional equivalence example of § 416.926a(m)(5).

12, 2014 WL 1479201, at *16 (N.D. W. Va. Apr. 15, 2014) (finding that minor did not need 24 hour adult supervision of insulin treatment to ensure survival where, while in the presence of an adult, she checked her blood sugar herself at school and home, and administered extra insulin when needed) with J.S.W. v. Colvin, No. 1:12-CV-315, 2013 U.S. Dist. LEXIS 134157, at *6, 2013 WL 5303742, at *3 (S.D. Ind. Sept. 19, 2013) (finding 24 hour adult supervision of insulin treatment required to ensure survival where the minor could not use insulin pens or needles on her own due to her inability to properly administer the medication, and nurse administered the medication at school.) Likewise, there was no evidence in the record that E.C. required 24 hour adult supervision of food intake to ensure survival. Gerette testified that E.C. brings a packed lunch to school every day, as well as snacks; however, the record does not indicate that adults must continuously monitor E.C.'s meals and snacks. Compare Burner v. Colvin, 2014 U.S. Dist. LEXIS 51917, at *12, 2014 WL 1479201, at *4 (N.D.W. Va. Apr. 15, 2014) (finding 24 hour adult supervision of food intake not required to ensure survival where "the record does not state that any adults monitor the [minor's] meals or snacks") with J.S.W. v. Colvin, 2013 U.S. Dist. LEXIS 134157, at *6–7, 2013 WL 5303742, at *3 (finding 24 hour adult supervision of food intake required to ensure survival where the record showed the minor child often refused to eat and "sneaks snacks even though she is not allowed.") Finally, the record does not support a finding that 24 hour supervision of physical activity is necessary to ensure survival in this case. E.C. is able to participate in extracurricular sports, and E.C.'s pediatrician, Kelly Nelson, M.D., indicated during a well child physical on October 5, 2011 that E.C. exercises 10 to 15 hours per week and "there are no activity or exercise concerns." R. 404. Compare Burner v. Colvin, 2014 U.S. Dist. LEXIS 51917, at *12, 2014 WL 1479201, at * 4 (finding 24 hour adult supervision of

---

Id. at * 19695–96.

physical activity not required to ensure survival where minor "played basketball for the whole season" her freshman year) with J.S.W. v. Colvin, 2013 U.S. Dist. LEXIS 134157, at *7–8, 2013 WL 5303742, at *3 (finding 24 hour adult supervision of physical activity required to ensure survival where before engaging in physical activity at school, minor child must "have a snack, get her blood sugar checked, and be administered insulin" and she was not permitted to participate in the general physical education program, or sports or school programs because "there is no qualified adult to supervise her and administer insulin.")  Accordingly, the ALJ's finding that E.C.'s impairments do not cause listing level functional limitations is supported by substantial evidence.

### B. Medical Opinion of Dr. Begum-Hasan

Gerette contends that the ALJ improperly rejected the opinion of E.C.'s treating endocrinologist, Dr. Begum Hasan, that E.C. requires 24 hour supervision of his insulin treatment, food intake, and physical activity to ensure his survival.

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. § 416.927(b).  Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight.  Campbell v. Bowen, 800 F.2d 1247, 1250 (4th Cir. 1986).  Rather, a treating physician's medical opinion on the issue of the nature and severity of an individual's impairments will be given controlling weight only when the opinion is: (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(c)(2); see also Craig v. Chater, 76 F.3d at 590.  Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it

11

should be accorded significantly less weight." Id. Further, the ALJ is not required to give controlling weight or special significance to a treating physician's opinion on issues that are reserved to the Commissioner, such as whether a claimant's impairments meet or equal the listings. 20 C.F.R. § 416.927(d); Social Security Ruling 96-5p (S.S.A. July 2, 1996), 1996 WL 374183, at *2, 1996 SR LEXIS, at *6.[10]

If a treating source's opinion is not entitled to controlling weight, the ALJ must determine the weight to give the opinion based upon an evaluation of the following factors: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist; and (6) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c); Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). The ALJ is not required to discuss each factor, but must provide an explanation for the weight assigned to a medical opinion that is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 SSR LEXIS 9, at *12,1996 WL 374188, at *5; see also Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) ("That the ALJ did not explicitly discuss all the § 404.1527(d) factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review."). Further, "[f]orm reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudicative process." Whitehead v. Astrue, No. 2:10-CV-35-BO, 2011 U.S. Dist. LEXIS 56182, at *25, 2011 WL 2036694, at *9–10 (E.D.N.C.

---

[10] "Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act. While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995) (citing Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989)).

12

May 24, 2011) (unpublished) (determining that a check-box form completed by a treating physician was not entitled to controlling weight where it was inconsistent with the physician's own treatment notes and gave no explanation or reasons for the findings, leaving the ALJ unable to determine whether the physician applied the relevant regulatory definitions).

The opinion at issue here is a "Questionnaire Regarding [E.C.]" completed by Dr. Begum-Hasan on July 2, 2013. R. 593. This opinion is a check-box form with two questions. In response to the question, "Does [E.C.] require 24 hour supervision of his insulin treatment, food intake, and physical activity to ensure his survival," Dr. Begum-Hasan checked "Yes."[11] Id. In response to the question, "In your opinion, does [E.C.] have an extreme limitation that interferes with his functioning at school," Dr. Begum-Hasan checked "No." Id.

In his decision, the ALJ evaluated Dr. Begum-Hasan's opinion as follows:

> Although I agree that [E.C.'s] condition does require monitoring, it is not to the level as intended by this listing. The claimant is able to attend school and participate in physical activities without significant limitations despite his condition.

R. 18.[12] Thus, the requirement that the ALJ's decision be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight" is satisfied. 1996 SSR LEXIS 9 at *12, WL at *5. Further, substantial evidence supports the ALJ's decision to afford limited weight to Dr. Begum-Hasan's opinion as reflected in the July 2, 2013 questionnaire because Dr. Begum-Hasan's opinion was contradicted by persuasive evidence of record. Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a

---

[11] Of course, this question does not specify "adult supervision."

[12] The ALJ also afforded the opinions of the state agency medical consultants little weight, "as they are not consistent with the evidence in file currently." R. 18. However, E.C. does not dispute the ALJ's assessment. State agency psychologist Howard Leizer, Ph.D. and pediatricians Joseph Duckwall, M.D. and Richard Surrusco, M.D. indicated that E.C. had marked limitation in attending and completing tasks but less than marked limitations or no limitations in the remaining functional equivalence domains. R. 59–66, 68–77.

13

treating physician in the face of persuasive contrary evidence") (citation omitted). Gerette testified that E.C. was able to monitor his diabetes himself. R. 42. There was no evidence in the record that E.C.'s food intake required 24 hour adult supervision to ensure his survival. Finally, the ALJ noted that E.C. was able to attend school and participate in physical activities without significant limitations.

### C. Credibility

Gerette also claims that the ALJ's credibility findings are not supported by substantial evidence. Gerette asserts that the ALJ's characterization of her testimony regarding how E.C.'s condition improved with the insulin pump is inaccurate. Gerette maintains that, even following the insulin pump, E.C.'s blood sugar continued to fluctuate. She further asserts that the ALJ's findings regarding E.C.'s ability to "do more on his own now" fails to acknowledge that "E.C. exists in a highly structured environment and without this environment, E.C. would not be able to attend school, complete school work, and participate in extra-curricular activities." Pl. Br. Summ. J. p. 21, Dkt. No. 15. The ALJ stated:

> After considering the evidence of record, I find that [E.C.'s] medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained below.

R. 18. Thereafter, the ALJ outlined her reasons for this determination, including that Gerette testified at the hearing that E.C.'s condition had improved with the insulin pump, and that he is able to do more on his own now, including spending time with friends and other age appropriate activities. Id. Further, the ALJ noted that, while E.C.'s blood sugar still fluctuates, he is able to attend school, complete school work, participate in extra-curricular activities and "handle age appropriate behavior in the home setting." Id. Finally, E.C. has not required any hospitalizations subsequent to his initial diabetes diagnosis.

14

A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). "If the claimant is a child who does not describe, or cannot adequately describe, his symptoms, the ALJ 'will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relative, or guardian.'" Barnes ex rel. T.J. v. Colvin, No. 4:12-CV-254-D, 2014 U.S. Dist. LEXIS 3876, 2014 WL 126039, at *4 (E.D.N.C. Jan. 13, 2014) (unpublished) (quoting 20 C.F.R. § 416.928(a)). "The ALJ must make specific findings concerning the credibility of the [caregiver's] testimony, just as he would if the child were testifying." Id. (quoting Dew ex rel. K.W. v. Colvin, No. 4:12-cv-129, 2013 U.S. Dist. LEXIS 122536, at *21, 2013 WL 4523617, at *8 (E.D.N.C. Aug. 27, 2013) (unpublished)). The ALJ is not required to accept the caregiver's testimony about the child's symptoms at face value. Meadows v. Astrue, No. 5:11CV00063, 2012 U.S. Dist. LEXIS 115150, at *30, 2012 WL 3542536, at *9 (W.D. Va. Aug. 15, 2012) (citing SSR 96-7p, 1996 SSR LEXIS 4) (noting that the ALJ must "weigh [a claimant's testimony about her symptoms] along with all of the evidence, including not only the objective medical evidence, but statements and other information provided by physicians or psychologists and other persons about her symptoms and how they affect her and any other relevant evidence in the case record.") Further, a reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. See Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 68 (citing Edeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997)).

After reviewing the entire record, I find that substantial evidence exists to support the ALJ's determinations regarding credibility. Gerette testified at the hearing that, although E.C. continued to have fluctuations in his blood sugar levels, "the pump has helped quite a bit . . . especially with sports activities and things." R. 18. Further, the medical records show that E.C. had a trend of improved glucose levels following the insulin pump, even though he had two visits where his glucose levels were not improved. Additionally, the ALJ recognized that E.C.'s blood sugar levels continued to fluctuate and that his diabetes required monitoring; indeed, she found marked limitations in the domain of health and well-being, noting that E.C. "continues to have difficulty maintaining normal blood sugar levels despite the institution of the insulin pump." R. 18. The ALJ found, however, that E.C. was capable of monitoring his own blood sugar, and despite these fluctuations, was also able to engage in a variety of age appropriate activities, including school and sports. The issue on appeal is whether the ALJ's decision is supported by substantial evidence, and I find that substantial evidence supports the ALJ's credibility findings.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to the Honorable Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days.

16

Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection.

    Entered:  February 2, 2016

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge